BARHAM *v.* NOWELL, MINOR, ETC.

No. 42185 March 5, 1962 138 So. 2d 493

*Welch, Gibbes & Graves, Shannon Clark,* Laurel, for appellant.

*Melvin, Melvin & Melvin,* Laurel, for appellee.

GILLESPIE, J.

Paul Nowell, plaintiff below and appellee here, sued Mrs. Ruth M. Barham, defendant below and appellant here, in damages for personal injuries sustained by appellee in a collision between the motorcycle appellee was riding and an automobile operated by appellant. The parties were traveling at right angles to each other and collided in an intersection controlled by an overhead electric street signal. The negligence charged was failing to stop for the red signal light, excessive speed, and failure to keep a lookout. The evidence was highly conflicting and the jury could have resolved the issues either way. It resolved the issues on liability against the appellant and returned a verdict in favor of appellee for $35,000. Judgment was entered accordingly and Mrs. Barham appealed to this Court.

Appellant's assignment of error No. 4 is that the verdict was against the overwhelming weight of the evidence. We are of the opinion that there is no merit in this assignment. It was a case for the jury.

The third assignment of error is directed to the amount of the verdict which appellant contends is excessive. We

do not reach this assignment because the case must be reversed on another ground.

The second assignment of error is based on the contention of appellant that the lower court erred in refusing to transfer the case to the chancery court. This assignment does not warrant discussion.

Appellant's first assignment of error presents the question whether the lower court erred in refusing to allow the jury to view certain motion picture films offered by appellant. We hold this was error.

Appellee received serious and painful injuries to his right leg. He was rendered unconscious by the collision and sustained a complete fracture of the bone between the hip and knee and both bones were broken below the knee. No joints were involved in the fractures. He was treated immediately on the spot by Dr. McRea, who lives near the intersection where the accident occurred. After spending the night in the Laurel hospital he was removed by ambulance to Jackson where orthopedic surgeons inserted a pin inside the upper bone and bolted a cuff on the lower break. He was then placed in a cast for several months, after which he wore a leg brace until about eight months after the accident. The medical proof consisted of the testimony of Dr. McRea, who treated him . immediately after the accident and sent him to Jackson and who treated him thereafter until the trial, and Dr. Bass, an orthopedic surgeon who examined appellee during the trial. In brief, Dr. McRea testified that appellee sustained permanent injuries that would require him to wear a bandage and guard to protect the shin and the injuries would result in appellee limping. He testified that a skin graft had been performed on appellee's shin and the skin had grown to the bone and due to bad circulation the place would give trouble the balance of his life.

Dr. Bass testified there was no reason from an orthopedic standpoint for the appellee to limp and that

there was good union of the bones. He was of the opinion that appellee sustained a five percent permanent disability.

The medical bills incurred in treating appellee amounted to about $2550. He lost one year from school.

Appellee and his parents testified that appellee had never been able to walk without a limp since the accident; that appellee could not walk over about half a mile without his leg swelling; that when appellee climbed steps he had to lead with his left foot, then bring his right foot to the step even with his left foot, and again lead with his left foot to the next step. The record shows that appellee limped very obviously in moving around the courtroom in the presence of the jury. There was a sharp conflict in the testimony on the issue whether appellee limped when he walked. One of his teachers testified that she had never seen appellee limp or otherwise indicate that he was injured.

Appellant employed Pendleton Detective Agency to take moving pictures of appellee. This was done the week before the trial. The employees of the Detective Agency, J. K. Thomas and S. J. Bounds, went to Laurel, Mississippi, and stayed three days observing appellee, and on January 25 took certain movies. Thomas testified as follows:

After going to appellee's home and meeting and talking to him under a pretext, he took the motion pictures in question on January 25, 1961. Thomas had been trained by an older employee how to use the camera with which the pictures were taken. It was a 16 millimeter Bell & Howell camera of standard make and in good condition. The pictures were taken at the normal speed of 16 frames per second. The films were developed by a commercial photographer and accurately and faithfully reproduced the scenes photographed and seen by him through the view finder. The films had not been altered, edited or spliced. The movies were taken

at various times and places, a number of the scenes being on the school ground where appellee attended school. Thomas was not a photographer or a commercial developer of films. The pictures were taken on a dark, cloudy day and in some of the scenes the appellee could not be identified, but the other scenes were sufficiently clear to identify appellee. Appellee was larger than the other children in the scenes (he weighed 180 pounds at 15 years of age), and on the day the pictures were taken he was wearing brown trousers and a bright red jacket, and these circumstances aided in identifying appellee. The pictures showed appellee walking in long strides, running, walking without a limp, going up ten steps at a fast trot, climbing a bank, going down steps normally, and failed to show any abnormality in these activities. He was trained to operate a projector to show the moving pictures at the speed they were made. Bounds corroborated Thomas, except that Bounds did not take the pictures and did not see through the view finder, but made substantially the same observations of appellee while the pictures were being taken as Thomas made.

■■ We are of the opinion that the lower court was correct in holding that the proper foundation was laid for the introduction of the films. The testimony of Thomas and Bounds was sufficient to establish that (1) Thomas was trained in the proper use of the camera used in making the films; (2) the camera was of standard make and in good working condition; (3) the camera was set and the pictures were taken at a speed of 16 frames per second; (4) the films after development accurately and faithfully reproduced the scenes portrayed and as viewed through the view finder; (5) the identity of the subject matter; (6) relevancy of the subject matter to the issues; (7) weather conditions prevailing; and (8) that the films would be shown or projected at the same speed as taken by the camera. We do not intend to say that all these matters must be proved in every

case before moving pictures are admissible. ▆ ▆ As pointed out in 8 Am. Jur., Proof of Facts, page 157, it is essential in all cases to prove relevancy of the subject matter to the issues, identity of the subject matter, and that the moving pictures present an accurate and faithful representation of the scenes filmed.

▆ ▆ In the case of Metropolitan Life Insurance Company v. Wright, 190 Miss. 53, 199 So. 289, the films were made by an expert, but that case is not authority for the proposition that moving pictures must be made by a professional photographer or developed by a professional or commercial photographer. In the cited case, the Court said that, "Evidence by means of motion pictures exhibited to a trial jury, while novel, is admissible when the accuracy with which they will reproduce the scenes photographed is proven—somewhat like the accuracy of an ordinary photograph is proven. 3 Wig. Ev., 3rd Ed., Sec. 798a."

The trial judge viewed the moving pictures and refused to let them be shown before the jury because, in his opinion, they were not clear enough. He permitted Thomas and Bounds to testify what they observed as to appellee's activities while the films were being made.

The films were sent to this Court with the record. Appellant moved that this Court view the films, which this Court did. Some of the scenes are too dark for identification of the subjects filmed, but the other scenes are, in our opinion, sufficiently clear to readily identify appellee. The moving pictures were a vital part of the defense and the jury should have had the benefit of this evidence. Cf. Thomas v. Fleming (Miss.), 128 So. 2d 854. The testimony of the two detectives described appellee's activities while the films were being made. Obviously, their testimony would be less convincing than moving pictures. A photographic representation of a scene is less likely to be distorted than a verbal one. 8 Am. Jur., Proof of Facts, page 155. The accuracy of a

verbal representation of a scene is subject to many limitations. The person who makes the observation is not likely to observe with complete accuracy. Language as a means of communicating the representation to another has its limitations. Human memory is faulty. And scenes verbally represented can be consciously or unconsciously misrepresented. Pictures can also be distorted, but not in the same way and not as easily as verbal representations. The moving pictures involved in this case are not merely cumulative evidence.

 We are unable to understand how appellee could have been prejudiced by the scenes which are not clear. If the appellee cannot be identified in some of the scenes, those scenes cannot do him any harm. The question of the admission of the moving pictures was a matter addressed to the sound discretion of the trial judge, but the judge evidently understood all the scenes should be clear enough to identify appellee.

The case is reversed and remanded for trial on the issue of damages only. Upon remand, retrial will be as directed in Vaughan v. Bollis, 221 Miss. 589, 73 So. 2d 160, so that the jury will have all the evidence before it in assessing damages.

Reversed and remanded.

*Lee, P. J.,* and *McElroy, Rodgers* and *Jones, JJ.,* concur.