# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-KA-01382-SCT

*JOSEPH ANTHONY ZATTONI a/k/a JOSEPH A.*
*ZATTONI a/k/a JOSEPH ZATTONI*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/12/2024 |
| TRIAL JUDGE: | HON. ELEANOR JOHNSON PETERSON |
| TRIAL COURT ATTORNEYS: | JAMES ANDERSON, JR. |
| | ANDREW JAMES WILLIAMS |
| | JAMES KURT GUTHRIE |
| | LUKE ENTERKIN WHITAKER |
| | STEVEN DARRYLL USRY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| |     MOLLY HALPIN McNAIR |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DANIELLE LOVE BURKS |
| DISTRICT ATTORNEY: | JODY EDWARD OWENS, II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/28/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**SULLIVAN, JUSTICE, FOR THE COURT:**

¶1.     This case stems from an argument between Joseph Zattoni and his girlfriend, Natalie Lambert. As Lambert attempted to leave the situation, Zattoni shot at her car. He then proceeded to chase her, smash her car-door window, and put her in his truck. The two drove around for several hours. During this time, law enforcement was notified of a possible

abduction and began searching for Lambert. The police eventually located Lambert. As a result, Zattoni was indicted for aggravated domestic violence, kidnapping, and felon in possession of a weapon.

¶2. After a trial, the jury found Zattoni guilty of kidnapping and felon in possession of a weapon. He was sentenced as a nonviolent habitual offender to the following: (1) for kidnapping, twenty-five years, with three years suspended, and (2) for felon in possession of a firearm, five years, to run concurrently with the kidnapping sentence.

¶3. On appeal, Zattoni argues that the trial court committed reversible error. Despite the trial court's erroneously admitting evidence that was more prejudicial than probative, the error was harmless. Thus, this Court affirms Zattoni's conviction.

**FACTS**

**I.     Factual Background**

¶4. On February 9, 2023, several law-enforcement agencies responded to a 911 call, which "advis[ed] that a white female was being dragged into a vehicle and also that a shot had been fired in that area." One of the responding officers was Trooper Skyla Tillis with the Mississippi Highway Patrol. When she arrived on the scene, Trooper Tillis learned that the suspect was driving a dark-colored pickup truck and that the victim had been dragged out of a Honda. After learning this information, Trooper Tillis began patrolling the nearby area and discovered an abandoned Honda that matched the description of the victim's vehicle. Tillis testified that the driver's side window of the vehicle was "busted" and that the driver's side rear tire was flat. She also discovered a purse inside of the vehicle, which contained a

2

driver's license that belonged to Natalie Lambert.

¶5. Investigator Willard Holifield with the Mississippi Bureau of Investigation was asked to assist in the investigation and was dispatched to the scene where the victim's Honda was discovered. Upon arriving at the scene, Investigator Holifield stated that the victim's blue Honda Accord was parked in a random residential driveway. Like Trooper Tillis, he also noted that the driver's side front window was broken and that the driver's side rear tire was flat.

¶6. Law-enforcement agencies continued to patrol the area looking for Lambert. Later that evening, Lambert was discovered by the police. At this time, Zattoni's location was unknown. Both Trooper Tillis and Investigator Holifield described Lambert's demeanor after being recovered by the police. Tillis stated that Lambert appeared overwhelmed and had bruises on her body. Likewise, Holifield stated that Lambert appeared distraught and had "abrasions" on her body.

¶7. While at the scene, Investigator Holifield interviewed Lambert. According to Holifield, Lambert had attempted to leave her boyfriend, Zattoni, after he struck her during an argument. Holifield also learned that there had been a shooting at Lambert's and Zattoni's residence, *i.e.*, Zattoni's father's trailer. Upon learning this information, Holifield went to the residence and discovered three nine-millimeter shell casings in the driveway of the residence.

¶8. A few days later, Zattoni was taken into custody. He was indicted in June 2023 for one count of aggravated domestic violence (Count I), one count of kidnapping (Count II), and one count of felon in possession of a firearm (Count III). His indictment also included a

3

sentencing enhancement under Mississippi Code Section 99-19-81 (Rev. 2020).

¶9.     Zattoni's trial began on September 3, 2024. Natalie Lambert testified for the State. She explained that at the time of the incident, she had been dating Zattoni for about four to five months and that the two had been living at Zattoni's father's house in Terry, Mississippi. On the morning of the incident, Lambert stated that she and Zattoni had argued about infidelity. Deciding to leave the situation, Lambert exited the residence and got into her vehicle. As she drove off, Lambert stated that she heard a gunshot. After she heard the gunshot, she realized that her tire was flat. She testified that she did not know if Zattoni had shot at the car or in the air because she was inside the car when the shot rang out. She denied that the gun belonged to her. But she did acknowledge that she previously had seen a gun inside the house.

¶10.    As she continued to drive away, Lambert stated that Zattoni "came up behind [her] in his dad's truck." According to Lambert, Zattoni used the truck to block her "to where [she] couldn't go in the road." At some point, Lambert was able to maneuver around Zattoni's truck and parked her car in a nearby residential driveway. When she parked her car, Lambert's driver's side window was partially rolled down. As she attempted to roll up the window, Zattoni appeared and attempted to push the window back down. In doing so, the window shattered. Then, Zattoni proceeded to open the car door, pick Lambert up, and put her in his truck. Lambert clarified that she did not voluntarily get in the truck.

¶11.    After being placed in Zattoni's truck, Lambert testified that the two drove around for a while. Initially, Lambert was in the passenger seat. Then, at some point during the journey,

4

the two switched places. While she was driving the truck, Zattoni had a handgun in his possession and was threatening to harm himself with it.

¶12.    Lambert testified that at one point, she proceeded to jump out of the moving vehicle from the passenger seat. In response, Zattoni stopped the truck, picked up Lambert, and put her back into the vehicle. He then went to a family member's house in an attempt to doctor Lambert's injuries. But the family member was not home. When asked why she jumped out of the vehicle, Lambert said that she "just wanted what was best for him and [she] just wanted to be away. [She] didn't want him to hurt himself, and [she] didn't want to continue to be around it." Lambert simply wanted to get out of the vehicle.

¶13.    The two continued to drive around before "eventually [Zattoni] just got out and told [her] to take his dad's truck back home." She explained that Zattoni exited the truck, and he walked toward the woods as she drove off. Lambert stated that she was "about five minutes from [Zattoni's] dad's trailer" when she was stopped by the police.

¶14.    At trial, Investigator Holifield testified that during the course of his investigation, he discovered that Zattoni had a criminal record and was not allowed to possess a firearm as a convicted felon. Holifield testified also that Zattoni admitted to possessing a weapon, being a convicted felon, and forcibly putting Lambert into his vehicle. Additionally, Holifield stated that he interviewed Zattoni, which was recorded. The State admitted the audio recording of Zattoni's interview and played it for the jury. The State also admitted the handwritten statements made by Zattoni during the interview.

¶15.    Zattoni testified in his own defense. While Zattoni admitted shooting Lambert's tire

in an attempt to stop her from leaving, he stated that he "didn't mean to hit the tire." According to Zattoni, he followed Lambert because she had a flat tire and because he wanted to make sure that she was okay. He claimed that he did not block Lambert's car with his truck. Instead, he asserted that she had pulled over due to having a flat tire and that he pulled up behind her car. Zattoni claimed that the car window broke because Lambert attempted to drive away while his hands were rolled up in the window. He explained that he had put his hands in Lambert's partially-rolled-down window while he was talking to her. Zattoni admitted that the two drove around for more than an hour and that they had taken turns driving the vehicle. He also acknowledged that Lambert had jumped out of the moving vehicle. But he stated that he had also jumped from the car, explaining that it "was one of our things" and that "when she did something crazy, I'd do the same thing." After driving around for a while, Zattoni testified that he told Lambert to drop him off, return the truck to the house, and the two would "go [their] separate ways for a little bit."

¶16.    While Zattoni admitted possessing and firing the gun, he denied pointing a gun at Lambert or threatening her. Additionally, he asserted that he "put [the gun] in a field." When asked if he was able to locate the gun and give it to the police, Zattoni said, "[w]hy would I do that? I'm a convicted felon."

## II.    Facts Regarding the Stipulation

¶17.    Before the jury was seated, Zattoni offered a proposed stipulation to the trial court. The trial court stated that "this would come in later, but [it would] hold this until then." At this point, the State interjected, asking, "were you saying you wanted to hold the stipulation

6

until later?" In response, the trial court stated, "I mean, we don't even have a jury in the box yet so what are we doing with the stipulation?" The State proceeded to raise concerns about the wording of the stipulation. The State claimed that "all" it wanted the stipulation "to do was track the allegation that was made in the indictment."

¶18.    After acknowledging that it would not be mentioning or reading the sentencing-enhancement portion of the indictment, the trial court explained that it usually states "what the counts are and read[s] them to the jury to make sure that they have no information about the charges." Then the trial court asked the parties to clarify:  "is it your request that it just state that he was convicted of a felony crime and not read anything else about the cause number or any of that information?" Defense counsel responded, "[t]hat would be our request." The State objected, stating again that it "wanted the stipulation to be all three convictions." In response, the trial court stated:

> I understand what the State is saying . . . . My question is very simply this:  is there any objection—the defense is asking that since we are going to stipulate as to the defendant having a prior conviction, for purposes of the case in chief so that there's no prejudice to the defendant, it's not necessarily saying what he's been convicted of?

¶19.    The State proceeded again to argue about the wording of the proposed stipulation. This prompted the following exchange between the trial court and the defense:

> [Trial court]: So this is not the stipulation that you will present for purposes of the trial before the jury. This is a stipulation you all are trying to present as part of the [c]ourt's voir dire? Is that what we're doing?
>
> [Defense]:    This was going to be for the jury. Historically, I've just given—when I was in your court before, I just gave it to you at the very, very beginning and you usually just put it in your

7

folder and that was read to the jury at some point during the trial that the two sides had stipulated that on the date in question in this case, February of '23, that he was a convicted felon.

[Trial court]: So we're having two different conversations, actually. To be honest, the defense has not asked me anything about what I would say in the voir dire.

[Defense]: I think—yeah.

[Trial court]: So I'm just going to read the indictment as I normally do without reading the enhancement portion of the indictment.

Additionally, the trial court and the State agreed that the issue regarding the language of the stipulation would be dealt with later.

¶20.    While reading Zattoni's indictment to the jury, the trial court stated Zattoni's exact prior convictions that were alleged in Count III, felon in possession of a gun. Immediately, Zattoni's attorney objected. The trial court denied the objection, stating, "I know what you want. No."

¶21.    After the jury was empaneled and before opening statements, the State announced that the parties "[had] reached an agreement as to the stipulation." The trial court took the stipulation under advisement because it was "not comfortable with the wording of [the stipulation]" and wanted to conduct its own research.[1]

¶22.    After the State presented its case and the defense rested, the trial court, outside the presence of the jury, asked the State to admit the stipulation and to rest its case. The trial court accepted the stipulation, which declared that "[t]he State and Defense agree that prior

---

[1]According to the record, this version of the stipulation included the phrase "[a]nd we stipulate that what's in the indictment is true[.]"

to the date of the incident, Joseph Zattoni had been a convicted felon as alleged in the indictment." The stipulation was read before the jury and admitted into evidence.

### III. Facts Regarding the Audio Recording of Zattoni's Police Interview

¶23.    Before opening statements, Zattoni's attorney objected to the State's use of an unredacted version of Zattoni's police interview. He asked the trial court to have the State use a redacted version of the recording or prohibit the use of the recording entirely. Zattoni's attorney asserted that the recording, specifically "the latter half," contained "extensive discussion of [Zattoni's] criminal record[.]" In response, the trial court asked if Zattoni had been "***Mirandized***[2] prior to giving his statement?" While defense counsel acknowledged that Zattoni had been made aware of his rights, he asserted that "the interview [was] overly prejudicial and of no value in this case other than to be prejudiced [sic] the defendant." The trial court noted the argument and overruled Zattoni's objection.

¶24.    When the State attempted to introduce the recording into evidence at trial, Zattoni's attorney renewed its objection to using an unredacted version of the recording. Zattoni argued that "the interview in total coming in unredacted without the parts that we believe are far more prejudicial than probative coming in." In response, the State argued that it was the "entire recording" and that Zattoni had been ***Mirandized*** before making these statements. Again, the trial court overruled Zattoni's objection, stating:

> Because the defendant was on notice of his rights and he waived those rights and voluntarily gave a statement, waived his right to counsel and was notified that anything he said could and would be used against him, the [c]ourt finds that the statement may be admitted and overrules the objection.

---

[2]***Miranda v. Arizona***, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

9

The unredacted recording was played for the jury.

¶25. Because the jury heard evidence of Zattoni's prior convictions and his previous encounters with the legal system, the trial court gave a limiting instruction. The following limiting instruction was given from the bench:

> Ladies and gentlemen of the jury, you have heard testimony that the defendant has prior convictions and encounters with law enforcement and the court system. The fact that the defendant has previously been found guilty of another crime or has had prior encounters with law enforcement or the court system does not mean that the defendant committed the crimes for which the defendant is now on trial and you may not use his testimony as proof of the crimes charged in this case. And that is the limiting instruction.

## STANDARD OF REVIEW

¶26. "The admissibility of evidence rests within the discretion of the trial court, and reversal is appropriate only when a trial court commits an abuse of discretion resulting in prejudice to the accused." *Ross v. State*, 954 So. 2d 968, 992 (Miss. 2007) (citing *Irby v. State*, 893 So. 2d 1042, 1047 (Miss. 2004)). Additionally, "[a] trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling." *Shaw v. State*, 915 So. 2d 442, 445 (Miss. 2005) (internal quotation marks omitted) (quoting *Jefferson v. State*, 818 So. 2d 1099, 1104 (Miss. 2002)).

## DISCUSSION

### I.     The Stipulation

¶27. According to Zattoni, since he had stipulated to being a convicted felon, the trial court erred by "read[ing] the indictment to the venire, which listed Zattoni's prior convictions for

10

possession of counterfeit instruments and accessory after the fact to murder." Zattoni argues that allowing the jury to hear the specifics of his prior convictions after stipulating served "no probative purpose, was overly prejudicial, and failed to comply with the Mississippi Rules of Evidence." Zattoni relies on Court of Appeals case *Herrington v. State*, 102 So. 3d 1241, 1248 (Miss. Ct. App. 2012), that states, "once the parties stipulate to the defendant's status as a previously convicted felon, admittance of the prior convictions into evidence is a violation of Rule 403 and Rule 404(b) [of the Mississippi Rules of Evidence]." Thus, Zattoni alleges that "[t]he trial court could have read a redacted version of the indictment . . . or paraphrased the indictment" to the jury, instead of reading the indictment verbatim.

¶28.　The State argues that this issue is waived because "[a]t no point did Zattoni ask the stipulation be read to the venire, nor did he ask the trial court not to read certain portions of the indictment including any language from Count 3." If the argument is not waived, the State also asserts that Zattoni's argument lacks merit because (1) the jury must be informed of the charges against the defendant, and (2) the indictment is not evidence.

¶29.　First, this issue is not waived. Zattoni submitted the stipulation at the outset of his trial in order to prevent the specifics of his prior convictions from being introduced to the jury. Additionally, his attorney later objected to the reading of Count III of the indictment, which the trial court denied. We find that Zattoni's attorney took every reasonable step to properly preserve this issue for appeal.

¶30.　Second, this Court finds that the trial court erred by informing the jury of the specifics of Zattoni's prior convictions. Pursuant to Rule 19.1(b)(2)(B) of Mississippi's Rules of

11

Criminal Procedure,

> When a prior conviction is an element of the principal charge, the fact of a prior conviction shall be submitted to a jury and proved beyond a reasonable doubt. However, the defendant may stipulate to, or waive proof regarding, the prior conviction and the trial court *shall* accept such a stipulation. The stipulation then *shall* be submitted to the jury with a proper limiting instruction.

MRCrP 19.1(b)(2)(B); *see also **Williams v. State***, 991 So. 2d 593, 605-06 (Miss. 2008).

¶31.    It is apparent from the record that there was confusion regarding the acceptance of the stipulation. Even the State acknowledges that "[t]he record suggests a lack of mutual understanding between the trial court and the prosecution" regarding the stipulation. Before a jury was even seated, Zattoni offered a stipulation to the trial court. Instead of accepting the stipulation, the trial court and the State entered into a debate about the language of the stipulation. Instead of resolving the dispute and accepting the stipulation before jury selection, the trial court took the matter under advisement. The stipulation was not accepted and admitted until after the State presented its case-in-chief. At that point, the jury already had heard several references to Zattoni's prior convictions.

¶32.    As the Court of Appeals correctly noted in ***Herrington***, in cases such as these,

> The jury did not need to know the details of [the defendant's] prior convictions to reach a verdict on the charge of felon in possession of a weapon; it needed only to know that there was one prior felony conviction. The type of prior conviction has no probative value regarding whether [the defendant] was a felon in possession of a weapon. Therefore, *once the parties agreed* to [the defendant's] status as a previously convicted felon, *there was no probative value in introducing the details of his prior convictions into evidence*.

***Herrington***, 102 So. 3d at 1248 (emphasis added).

¶33. When the stipulation was presented at the beginning of the trial, the trial court was required to accept it. If the trial court had issues with the wording of the stipulation, the issue should have been resolved and accepted the stipulation before the start of the trial. The trial court's delay in accepting the stipulation allowed the State to introduce specific details regarding Zattoni's prior convictions, which contradicts the purpose of stipulations. Therefore, we find that the trial court erred by not accepting the stipulation until after the State had presented its case-in-chief.

## II. The Unredacted Audio File

¶34. Zattoni argues also that the trial court improperly admitted an unredacted audio recording of his interview with police, which "included evidence of Zattoni's prior crimes" that were "provided in response to police questioning." He asserts that "the portions of the audio file that discussed his unrelated criminal convictions were inadmissible under Rule 403 and 404 of the Mississippi Rules of Evidence." According to Zattoni, instead of conducting a proper Rule 403 analysis, the trial court erroneously "reasoned that because Zattoni [had been] *Mirandized*, the entire audio file was admissible." The State argues that the trial court did not err by admitting the recording in its entirety because:

(1) "the statement and its tangential references to other crimes were not offered to show that he acted in conformity with other bad acts in violation of Rule 404(b) but offered to tell a complete story and to show consciousness of guilt[,]"

(2) Zattoni's "references to his criminal history were continually intertwined with his admissions and explanations about his present charges[,]"

(3) while the trial court considered the standard set forth in *Miranda*, "[t]he

13

record[] shows Rule 404(b) arguments were presented, heard, and ruled on."

(4)     Zattoni did not "offer a redacted version of his statement."

¶35.    We disagree. After listening to the entirety of the sixty-minute audio recording, this Court determined that only sixteen of those minutes concerned events surrounding Zattoni's current charges. The rest of the sixty-minute audio recording concerned Zattoni and Investigator Holifield's conversations about (1) Zattoni's drug use; (2) Zattoni's associations with criminal organizations, such as the Aryan Brotherhood; (3) Zattoni's attempts to flee from the police, a crime for which he had not been charged; (4) the details regarding Zattoni's prior convictions; and (5) either silence or background noise as Zattoni wrote down his statement.

¶36.    The majority of the statements contained within the audio recording do not concern the crimes for which Zattoni was being prosecuted. As a result, the only purpose they could serve were to paint Zattoni in a bad light. Additionally, we cannot fault Zattoni for not providing a redacted version of the recording because "[i]n a criminal case, the burden of proof remains always with the prosecution on each element of the offense." *Moore v. State*, 348 So. 3d 322, 329 (Miss. 2022) (internal quotation mark omitted) (quoting *Heidel v. State*, 587 So. 2d 835, 843 (Miss. 1991)). The only obligation Zattoni bore was to object properly to the State's admitting of the recording, which he did on multiple occasions. He was under no obligation to help the State satisfy its burden of proof.

¶37.    Second, the record does not support any inclination that the trial court considered Mississippi Rules of Evidence 404(b) or 403 in determining the admissibility of the

14

recording. Even if the recording satisfied Rule 404(b), it fails the Rule 403 balance test because Zattoni's statements were more prejudicial than probative. *See **Pitchford v. State**,* 45 So. 3d 216, 246 (Miss. 2010) ("Rule 404(b) exceptions are, indeed, subject to a Rule 403 balancing test."). While the trial court did not say the magic words regarding the Rule 403 balancing test, the trial court clearly admitted the unredacted recording solely because Zattoni had been ***Mirandized*** and had been made aware that his statements could be used against him. *See **Pitchford**,* 45 So. 3d at 246; *see also **Jenkins v. State**,* 75 So. 3d 49, 55 (Miss. Ct. App. 2011). The fact that Zattoni had been ***Mirandized*** does not affect the balancing of prejudicial versus probative value of the recording because each standard protects different interests.[3] Therefore, the trial court did not conduct a proper admissibility analysis and erred by admitting the unredacted recording because it was more prejudicial than probative.

### III.   Harmless Error

¶38.    The State argues that if the trial court committed any error, it was harmless because "[t]he evidence of Zattoni's guilt was overwhelming." Zattoni argues that the error is not harmless because "the record reflects a real and substantial risk of prejudice." Zattoni asserts that since one venire member had an issue after hearing the nature of his prior convictions, there was a possibility that similarly situated jurors felt the same. He claims that the trial

---

[3]This Court has stated that "[t]he purpose of the ***Miranda*** warnings is to protect the individual's constitutional rights against illegal government intrusion." ***DeLoach v. State***, 722 So. 2d 512, 518 (Miss. 1998) (citing ***Miranda***, 384 U.S. at 444). Rule 403's balancing test, by contrast, seeks to prevent evidence from being introduced that could result in an unfair and prejudicial trial. *See **Welde v. State**,* 3 So. 3d 113, 117 (Miss. 2009) ("Rule 403 is an ultimate filter through which all otherwise admissible evidence must pass." (internal quotation marks omitted) (quoting ***Crawford v. State***, 754 So. 2d 1211, 1220 (Miss. 2000), *disagreed with on other grounds by **Dilworth v. State**,* 754 So. 2d 1211 (Miss. 2000))).

court's failure to exclude the "highly prejudicial evidence of prior bad acts . . . taint[ed] the fairness of the proceedings."

¶39.    This Court has held that

> [E]rrors may be deemed harmless where "the same result would have been reached had they not existed." "[E]ven where error has occurred, we will not reverse a conviction where the overwhelming weight of the evidence supports the guilty verdict."

*Tate v. State*, 912 So. 2d 919, 926 (Miss. 2005) (second alteration in original) (citations omitted). "A criminal [defendant] is not entitled to a perfect trial, only a fair trial." *Hutto v. State*, 227 So. 3d 963, 998 (Miss. 2017) (internal quotation marks omitted) (quoting *Ronk v. State*, 172 So. 3d 1112, 1148 (Miss. 2015)).

¶40.    Even without the audio recording, the State presented overwhelming evidence of Zattoni's guilt for the crimes of kidnapping and felon in possession of a gun. Regarding the kidnapping charge, the jury heard testimony from the victim, Lambert. Specifically, the jury heard Lambert state that she did not voluntarily get into Zattoni's truck and that she intentionally jumped out of the vehicle because she no longer wanted to be there. As for the possession of a gun by a felon, Zattoni admitted on the stand that he was a convicted felon, that he intentionally fired the gun in the direction of Lambert's car, and that he intentionally threw the gun in a field to get rid of it due to his status as a convicted felon. Additionally, the trial court gave a limiting instruction regarding considering Zattoni's prior convictions and previous encounters with law enforcement. By giving this instruction, the trial court "cured any possible prejudice that could have occurred." *King v. State*, 857 So. 2d 702, 723 (Miss. 2003) (citing *Day v. State*, 589 So. 2d 637, 644 (Miss. 1991)). In light of the evidence

provided and limiting instruction, the above-mentioned errors were harmless.

## CONCLUSION

¶41.     Even though the trial court erred by allowing prejudicial evidence to be admitted, those errors were harmless. The State presented overwhelming evidence that demonstrated Zattoni kidnapped his girlfriend and possessed a gun while being a felon. Zattoni's conviction is affirmed.

¶42.     **AFFIRMED.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., ISHEE, GRIFFIS AND BRANNING, JJ., CONCUR.**